IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

T-MOBILE SOUTH LLC,              :
                                 :
        Plaintiff,               :
                                 :
v.                               :      CIVIL ACTION NO.
                                 :      1:10-CV-1638-RWS
CITY OF MILTON, GEORGIA,         :
                                 :
        Defendant.               :
                                 :


## ORDER

This case is again before the Court on Plaintiff's Motion for Partial Summary Judgment [23]. The Court's previous Orders on Plaintiff's motion ([33], [39]) were reversed by the Eleventh Circuit and the case was remanded. (11th Cir. Opin., [56].) After reviewing the Circuit Court's opinion, the Parties' submissions, and the record, the Court enters the following Order.

## Background

The factual background is fully laid out in the Eleventh Circuit's opinion [56] and the Court's prior Order [33]. What follows is a brief overview of the case's procedural history and the Circuit Court's holding.

T-Mobile moved for partial summary judgment on the issue of whether the City of Milton ("Milton") violated 47 U.S.C. § 332(c)(7)(B)(iii), which provides: "Any decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in the written record." On June 24, 2011, the Court entered an Order ([33]) holding that Milton had failed to meet the statute's writing requirement. In reaching its decision, the Court only considered Defendant's initial decision letters (two denial letters and a conditional approval letter), which did not set forth the reasons underlying Milton's decisions. ([33] at 5-7.) The Court declined to consider other written documents in the record such as hearing transcripts and minutes. (Id.)

In that same Order, the Court remanded the case to Milton "to adequately state in writing its grounds for denial and/or conditional approval" because "[s]uch a proper written denial by the Defendant is necessary in order for the Court to rule on the issue of whether there was substantial evidence to support Defendant's decisions." ([33] at 8.) But upon T-Mobile's motion for reconsideration ([35]), which argued that remand is an improper remedy for

2

failure to satisfy the Telecommunications Act's ("Act") writing requirement,

the Court found that Milton's conduct warranted an injunction.  ([39]).

Accordingly, the Court permanently enjoined Milton from denying T-Mobile's

applications, subject to T-Mobile producing proper wind load certifications for

each of the three sites.  ([39] at 7.)  Milton appealed.

The Eleventh Circuit disagreed with the Court's interpretation of §

332(c)(7)(B)(iii) and held that Milton had satisfied the Act's writing

requirement.  (11th Cir. Opin., [56] at 26.)  The Circuit Court stated:

> The words of the statute we are interpreting require
> that the decision on a cell tower construction permit
> application be "in writing," not that the decision be
> "in a separate writing" or in a "writing separate from
> the transcript of the hearing and the minutes of the
> meeting in which the hearing was held" or "in a single
> writing that itself contains all of the grounds and
> explanations for the decision. . . . All of the written
> documents should be considered collectively in
> deciding if the decision, whatever it must include, is
> in writing.

(Id. at 25.)  According to the Circuit, to determine whether Milton satisfied §

332(c)(7)(B)(iii), the Court should have considered: (1) transcripts of the

Planning Commission's hearings; (2) transcripts of the City Council's hearings;

(3) the initial decision letters sent from Milton to T-Mobile; and (4) detailed

3

minutes of the City Council hearings.  (Id. at 25-26.)  In light of the Eleventh

Circuit's opinion, the Court now considers whether, based on the whole written

record, Milton's decisions were supported by substantial evidence.

## Discussion

### I.       Legal Standard - Summary Judgment

Federal Rule of Civil Procedure 56 requires that summary judgment be

granted "if the movant shows that there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law."  "The moving

party bears 'the initial responsibility of informing the . . . court of the basis for

its motion, and identifying those portions of the pleadings, depositions, answers

to interrogatories, and admissions on file, together with the affidavits, if any,

which it believes demonstrate the absence of a genuine issue of material fact.'"

Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1259 (11th Cir. 2004)

(quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  Where the

moving party makes such a showing, the burden shifts to the non-movant, who

must go beyond the pleadings and present affirmative evidence to show that a

genuine issue of material fact does exist.  Anderson v. Liberty Lobby, Inc., 477

U.S. 242, 257  (1986).

4

The applicable substantive law identifies which facts are material.  Id. at 248.  A fact is not material if a dispute over that fact will not affect the outcome of the suit under the governing law.  Id.  An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Id. at 249-50.

Finally, in resolving a motion for summary judgment, the court must view all evidence and draw all reasonable inferences in the light most favorable to the non-moving party.  Patton v. Triad Guar. Ins. Corp., 277 F.3d 1294, 1296 (11th Cir. 2002).  But, the court is bound only to draw those inferences which are reasonable.  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  Anderson, 477 U.S. at 249-50 (internal citations omitted); see also Matsushita, 475 U.S. at 586 (once the moving party has met its burden under Rule 56(a), the nonmoving party "must do more than simply show there is some metaphysical doubt as to the material facts").

5

II.     **Decisions Supported by Substantial Evidence**

A.     Substantial Evidence Standard

"Substantial evidence" is not defined in the Act. "The Conference

Committee for the [Act], however, expressly noted 'substantial evidence' is

meant to be 'the traditional standard used for judicial review of agency

actions.'" Preferred Sites, LLC v. Troup Cnty., 296 F.3d 1210, 1218 (11th Cir.

2002) (citations omitted). "Substantial evidence is more than a mere scintilla.

It means such relevant evidence as a reasonable mind might accept as adequate

to support a conclusion." Id. (quotations and citation omitted). "Although the

'substantial evidence' standard is not as stringent as the preponderance of the

evidence standard, it requires courts to take a harder look then when reviewing

under the arbitrary and capricious standard." Id. (citation omitted). "Finally, to

determine whether the substantial evidence standard is met, a court should view

the record in its entirety, including evidence unfavorable to the state or local

government's decision." Id. (citation omitted).

B.     Evidence in the Written Record

As the Eleventh Circuit's opinion notes, the application process and

written record are similar for the three proposed sites (Mountain Road,

AO 72A
(Rev.8/82)

Hopewell Road, and New Providence Road).  The City of Milton Planning Commission held a hearing on March 23, 2010, to discuss all three applications. That hearing was transcribed and Action Minutes memorializing the hearing were later approved.  The Planning Commission voted unanimously to deny all three applications.  Then, on April 26, 2010, the City Council of Milton held its public hearing on the three applications.  That hearing was also transcribed and summarized in approved minutes.[1]

The City Council denied T-Mobile's Mountain Road and Hopewell Road applications, and conditionally approved the New Provide Road tower.  It is undisputed that Milton's initial letters did not contain any reasons for the City's decisions.  Thus, the Court directs its attention to the written record from the Planning Commission and City Council proceedings.[2]

    1.    *Mountain Road Location*

        a.    Evidence in support of the application

---

[1] The minutes from the City Council hearing mirror the contents of the hearing transcript.

[2] The Court and the Eleventh Circuit agree that conditional approvals, such as the one issued here, can constitute final adverse actions and trigger plaintiffs' right to file suit claiming violations of the Act.  Thus, the substantial evidence standard must be satisfied for all three of Milton's decisions.

7

Shawn Blassingill, T-Mobile's representative, spoke at the City Council hearing in favor of the application.[3]  First, he stated that there were no "collocation" opportunities on existing towers or structures in the area that would meet T-Mobile's coverage objectives.  (City Council Minutes, [22] CD-Rom, MTN_RD_000682.)  Further, he stated, there were no industrial or commercial zones in the search area.  (Id.)  He said that T-Mobile had found an alternate tower site on a nearby golf course, but the property owners were not interested in leasing space to T-Mobile.  (Id.)  He noted that the proposed Mountain Road tower satisfied the height and set-back requirements under the City's zoning ordinance, and there would be minimal disturbance to the natural surroundings because T-Mobile planned to use an existing gravel driveway to access the site and no trees would be cut down to build the tower.  (Id.)

In response to statements made by opponents of the tower, Blassingill addressed the possibility of lowering the tower height.  He stated that the

---

[3] The statements given at the Planning Commission hearing – both in favor of, and in opposition to, all three applications – were repeated almost verbatim at the City Council hearing.  Everyone who spoke before the Planning Commission hearing also spoke in front of the City Council, along with a few additional speakers.  Thus, to avoid unnecessary repetition and give the most complete account of the evidence, the Court focuses its discussion on the evidence presented at the City Council hearing.

AO 72A
(Rev.8/82)

proposed 145-foot tower was the minimum height required to sustain calls in the area.  (Id. at 000682-83.)  He said that if T-Mobile reduced the tower height to 100 feet, it may improve the aesthetics, but would require the company to put up another tower nearby, which may not be allowed under Milton's separation requirements for such structures.  (Id. at 000683.)

Marquise Lewis, T-Mobile's radio frequency engineer, dismissed the possibility of using alternative technologies to improve cell service in the area. She explained that a "peak-a-cell" design allows T-Mobile to place a small device on an existing structure; however, those devices serve a very small radius and require a high number of structures on which to collocate, which were not available in Milton.  (Id. at 000688.)  Furthermore, she explained, at-home "booster" or repeater devices would not work in Milton because the signal strength in the area is not adequate in the first place.  (Id.)  She analogized those devices to turning up the volume on a radio station when the station starts to experience static – you do not end up with a clearer signal, only louder static.  (Id.)  She also noted that voice services, not data services, were the focus of T-Mobile's application, stating: "That is in accordance with our research and what we found that in general, in the area that we're trying to

9

serve, a customer cannot reliably make and maintain a call in their vehicle and in their home."  (Id. at 000691.)

Harris Simpson, a real estate appraiser, was hired to study the Mountain Road site and render an opinion about whether the proposed tower would have an impact on property values.  (Id. at 000689.)  According to Simpson, the data "didn't suggest that there was an impact on appreciation or price per square foot."  (Id.)  He concluded: "we looked at this proposed tower location and we felt that it was a reasonable location and we did not think that it would impact property values or appreciation rates of surrounding properties and that is in the data."  (Id.)

Georgia Tax and Regulatory Solutions ("GTRS"), an independent consulting firm hired by Milton to evaluate all three of T-Mobile's applications, made some findings in favor of the Mountain Road tower.  Specifically, GTRS found: (1) the property is zoned Agricultural and telecommunications towers are a permitted use in that zoning designation; (2) "the Applicant has demonstrated that there is poor coverage in this geographic service area;" and (3) the property is wooded and will provide some natural screening for the tower and its accessory structures, and a minimum number of trees would need

10

to be cut down because the Applicant proposes to use an existing driveway.
(Id. at 000678.)

One resident, Mr. Prakash, spoke in favor of the Mountain Road tower. He stated that he was unable to use his T-Mobile phone in his house.  (City Council Hearing Re: Mountain Road, [1-2] at 6 of 23.)  Mr. Prakash said that he knew of "several other people in the same situation in this neighborhood."  (Id.)

b.      Evidence against the application

Lynn Tully, Milton's Community Development Director, spoke against the proposed tower.  According to Tully, staff reviewed T-Mobile's application and "determined the proposed monopole cell tower is inconsistent with the intent and policies of the focus Fulton 20/25 comprehensive plan in the areas of encouraging development that is consistent with the surrounding scale transition of densities and uses, . . . as well as protecting the existing rural character of Northwest Fulton."  (City Council Minutes, [22] CD-Rom, MTN_RD_000676.) Staff also concluded that the proposed tower was inconsistent with adjacent land uses – single family residences on large agricultural parcels and associated agricultural uses such as barns and riding rings.  (Id.)

GTRS's Mountain Road report contained some findings unfavorable to the proposed tower, specifically: (1) an alternate location was identified, which would provide better screening of the tower and enable the tower to be placed further from residences and roadways (but recognizing that the property owners at that location would not discuss the possibility of putting a tower there); (2) a balloon test showed that the tower was clearly visible above the tree line and this "could have an adverse impact on the adjacent and neighboring properties;" and (3) "[a]lthough a reduction in height may not provide the signal strength desired by the Applicant, it will greatly improve coverage in the area." (Id. at 000677-81.)

Four residents spoke against the Mountain Road tower. They gave several reasons for denial, including: availability of other technologies to improve cell service (such as those addressed by Ms. Lewis, T-Mobile's engineer); preserving the rural atmosphere and unique landscape of Milton; and potential negative impact on property values. (See generally, City Council Transcript, [1-2].) Additionally, twenty-five residents conducted their own test regarding the need for better T-Mobile coverage in the area. They used T-Mobile phones to make calls from indoors in the vicinity of the proposed

12

Mountain Road tower and submitted affidavits saying they had "100 percent coverage" in the area.  (City Council Minutes, [22] CD-Rom, MTN_RD_000687.)  They contended that there was adequate T-Mobile coverage already and no coverage gap warranting a tower.  (<u>Id.</u>)

        c.      Rationale underlying Milton's decision

Toward the conclusion of the Planning Commission's hearing, Councilmember Ragsdale offered his reasons for denying *all three* applications: (1) T-Mobile had not met the technical requirement under Milton's zoning ordinance of providing wind load certifications with its applications; (2) lack of evidence that users in the service areas saw the need for better T-Mobile Coverage; and (3) aesthetic concerns and the potential existence of alternate tower sites that may be more aesthetically pleasing.  (Planning Comm'n Transcript, [1-5] at 8 of 14.)  Chairman Moore added that his three votes were partly based on the fact that something below 100 percent cellular coverage is acceptable, and lower tower heights might accomplish an inferior level of coverage but be "more in keeping with the aesthetics of Milton."  (<u>Id.</u>)[4]  The

---

[4] These comments offered by Ragsdale and Moore are the only ones in the Planning Commission's transcript that discuss the Commission's rationale for its decisions.  No rationale was recorded in the Action Minutes from the Commission's

Action Minutes from the Planning Commission's hearing provide no further insight into the Commission's decisions.  (See generally, Planning Comm'n Action Minutes, [22] CD-Rom.)

At the City Council hearing on April 26, 2010, Councilmember Bailey moved to deny the application "for the following, not exhaustive set of reasons:" (1) Plaintiff's failure to submit a wind load certification with its application, as required by Milton's zoning code; (2) "the proposed tower is inconsistent with the adjacent land use as a single-family residence on large agricultural parcels and incompatible based on the location of the tower to adjacent residential structures;" (3) "the proposed tower is inconsistent with the surrounding scale, transition of densities, and does not protect the existing rural character of Milton;" (4) "all of those reasons supporting denial set forth in the March 22, 2010 [GTRS] letter to the City of Milton Planning Development Division;" and (5) "the multitude of other reasons" given by citizens at the hearing.  (City Council Transcript, [1-2] at 14 of 23.)  GTRS's letter referenced by Councilmember Bailey gave the following reasons for recommending

hearing.  The comments, offered at the very end of the hearing in summary fashion, apply to all three applications.  To avoid repetition, the Court will not reiterate these arguments with respect to the other two applications.

14

denial: (1) there is no "coverage gap" in this area, but "wireless coverage does not meet the level desired by the Applicant;" and (2) "review of the topography of nearby properties indicates that there are properties that would provide better screening of the tower and therefore minimize its adverse aesthetic impact." (GTRS Letter Re: Mountain Road, [22] CD-Rom, MTN_RD_000413.)  The Council accepted Ms. Bailey's motion without further discussion and voted unanimously to deny the application.

2.    <em>Hopewell Road Location</em>

a.    Evidence supporting the application

Again, Mr. Blassingill spoke on behalf of T-Mobile.  He noted that this was a much larger parcel than the Mountain Road site, so T-Mobile would have greater ability to move the proposed tower around and screen it from surrounding neighborhoods.  (City Council Minutes, [22] CD-Rom, MTN_RD_ 000697.)  He stated that this application also satisfied the zoning ordinance's height and set-back requirements, and there would be minimal disruption to the surrounding area because T-Mobile planned to use an existing gravel drive for access and would not have to cut down any trees.  (Id. at 000697-98.)  Mr. Blassingill acknowledged that there were other parcels in the search area "that

15

would provide better screening." (Id. at 000698.) All of those property owners were approached, apparently to no avail. (Id.)

Mr. Blassingill explained why wind load certifications had not been produced for the three proposed towers. Typically, he stated, those types of certifications (wind load, soil, etc.) are done after the zoning phase because zoning officials may impose conditions or request changes to the proposed structure (e.g., a different design or type of structure). For the certifications to be accurate, they must take into account any mandated alterations. (Id.)

Ms. Lewis acknowledged that some pockets of the service area already had adequate coverage, but noted that there were also gaps in coverage, which cause interruptions when traveling throughout the area. (Id. at 000705.) "Gaps in coverage," according to Ms. Lewis, occur when customers are unable to make calls or when they are unable to maintain calls in the service area. (Id. at 000706.) She also explained that even if a cell tower can reach a 25-mile service area, half-watt cell phones are unable to send signals to a tower that far away. Thus, practically speaking, towers are limited to a very small radius. (Id. at 000705.)

AO 72A
(Rev.8/82)

Ms. Lewis further explained the need for a tower in this particular location.  She said that T-Mobile has a continuous feedback system for its subscribers where they can report trouble making calls or problems with dropped calls.  (<u>Id.</u> at 000707.)  Those complaints, she stated, are not necessarily from residents within the service area, but also include customers driving through the service area.  (<u>Id.</u>)  She said: "we have had enough feedback from our customers to know that there is a significant customer demand for better coverage in that area and it would come from both residents and people who drive through the area."  (<u>Id.</u>)  T-Mobile did not submit specific customer complaints to the Council because, Lewis explained, it would put them at a competitive disadvantage, but they did submit an affidavit and coverage maps explaining the need for more coverage in Milton.  (<u>Id.</u> at 000708.)

As with the Mountain Road location, GTRS found that the tower was a permitted use in the agricultural-zoned area and that T-Mobile had demonstrated there was poor coverage in the area.  (<u>Id.</u> at 000694-95.)  Two residents spoke in favor of the tower, including the owner of the property on which the tower was to be located.  He stated that the proposed lease agreement with T-Mobile would allow him to pay increasing taxes on his property and

continue operating his farm, which is a popular fixture in the Milton community and comports with the City's cultural and aesthetic values.  (City Council Transcript, [1-4] at 5 of 25.)  The other resident, Ms. Grayson, stated that she experienced dropped calls with T-Mobile in the area.  (Id. at 5-6 of 25.)

b.      Evidence in opposition to the application

Milton's Community Development staff again recommended denial of T-Mobile's application because the proposed tower was inconsistent with Milton's long-term development plan and adjacent land uses.  (City Council Minutes, [22] CD-Rom, MTN_RD_000693.)  GTRS's report on the Hopewell Road application gives the following reasons for recommending denial of the application: (1) a review of the surrounding area "indicates that there are properties that would provide better screening of the tower and therefore minimize its adverse aesthetic impact;" (2) "Applicant's own [radio frequency] engineer has already approved these [alternate sites] as capable of providing the Applicant's coverage needs;" and (3) "the alternate sites are located closer to the areas where the coverage gaps exist and would provide more consistent coverage at the desired coverage level." (City Council Minutes, [22] CD-Rom, MTN_RD_000697.)  Further, GTRS noted, unlike the Mountain Road location,

18

the Hopewell Road site does not have existing tree coverage to provide natural screening of the tower; the tower would be clearly visible from nearby properties and roadways and "could have an adverse impact on adjacent and neighboring properties."  (Id. at 000695.)

Opponents of the tower submitted a petition with more than 250 resident signatures.  (City Council Transcript, [1-4] at 6 of 25.)  Residents who spoke at the hearing expressed general concern about the appearance of the tower and potential decline in property values.  (Id. at 6-7 of 25.)  They also expressed specific concern about Hopewell Road's status as a scenic highway corridor and questioned the need for additional or improved T-Mobile coverage in the area. (Id. at 7 of 25.)

One resident, Ms. Norvell, stated that she conducted her own study about alleged gaps in coverage.  She used her husband's T-Mobile phone to make calls from the area during different times of the day, inside and outside of her car, as well as inside and outside of homes.  She reported that she experienced no dropped calls and good reception.  (Id. at 7 of 25.)  She also stated that some T-Mobile customers living right next door to existing towers still do not get service, questioning the efficacy of the towers in the first place.  (Id. at 8 of 25.)

19

Ms. Norvell also took pictures from her front yard during the balloon test, which she presented to the City Council.  The photos showed the proposed tower – at approximately fifteen stories – towering over her single-story home and the homes of her neighbors.  (Id. at 7-8 of 25.)

Mr. Worley, a realtor and opponent of the tower, stated that property values would drop if the tower were built.  He reasoned, "I've done this for 31 years as far as selling homes, and no one has ever come to me and said, I want to buy a house next to a retention pond, a water tower and now a cell tower." (Id. at 9 of 25.)  He mentioned a specific nearby neighborhood north of Alpharetta, Georgia where eleven homes sold in the last three years.  However, one home with a cell tower right behind it never sold.  (Id.)

c.        Rationale underlying Milton's decision

Aside from the reasons discussed above with respect to the Mountain Road application, the Planning Commission's hearing transcript and Action Minutes do not offer any additional information about the Commission's rationale for recommending denial of the Hopewell Road application.  (See generally, Planning Comm'n Transcript, [1-3]; Planning Comm'n Action Minutes, [22] CD-Rom, MTN_RD_000519.)  During the City Council hearing,

20

Councilmember Tart moved to deny the Hopewell Road application for the following "non-exhaustive" reasons: (1) T-Mobile's failure to provide a wind load certification; (2) the proposed tower is "inconsistent with the adjacent land uses;" (3) the proposed tower is "inconsistent with surrounding scale, transition of densities, and does not protect the existing rural character of Milton;" and (4) for all of the reasons set forth by GTRS. (City Council Transcript, [1-4] at 14-15 of 25.) The motion passed unanimously.

Other Councilmembers elaborated on their reasons for denying the application. Councilmember Longoria stated: "[W]hat we're talking about here is a question of height. If T-Mobile had come to us with an application that was requesting a 12-foot tower, we wouldn't be having this discussion, and so the reality is at some point in time, the height starts to impact the individuals that surround the property." (Id. at 15-16 of 25.) Councilmembers Longoria and Lusk noted their belief that better technology that "blends into the landscape" is available and would be more appropriate for Milton than the proposed towers. (Id. at 16 of 25.) Councilmember Lusk also stated that "there are other sites in the immediate vicinity that are available and would be less obtrusive than [the Hopewell Road location]." (Id.) However, he did not refer to any specific

21

alternative sites.  Finally, Councilmember Thurman stated that she felt "this

kind of tower would hurt more people than it helps at the height that they have

requested."  (Id.)

3.     *New Providence Road Location*

a.     Evidence supporting the application

The proposed New Providence site is distinct from the other two

locations because it is situated next to an existing power easement with power

lines and poles.  GTRS recommended approval of the tower with the following

conditions: submission of a wind load certification, a stealth design, and a

maximum height of 100 feet.  When asked why GTRS was recommending

approval for this tower, GTRS's representative responded that "putting a tower

next to the existing [power poles] aesthetically is probably going to be the

smallest impact on the area possible" and "we didn't see a better alternative."

(City Council Minutes, [22] CD-Rom, MTN_RD_000715.)  GTRS also offered

its opinion that, even at a height of 100 feet, the tower would address coverage

gaps in the area.  (Id. at 000717.)

However, Ms. Lewis disputed that a 100-foot tower would satisfy the

coverage objectives of T-Mobile and stated, "we do submit an application for

22

the minimum height that we need to achieve our objectives." (Id. at 000726.)

She described the process by which T-Mobile evaluates the effect a proposed

tower will have on a coverage area, which involves computer modeling and

field data. (Id. at 000728.)  According to the model for New Providence Road,

with the proposed 150-foot tower, there would be 98% reliability that a T-

Mobile customer would be able to make and maintain a call in the coverage

area.  Mr. Blassingill noted that GTRS produced no such data to support its

opinion that a 100-foot tower would meet the area's coverage needs.  (Id. at

000718.)

        Mr. Blassingill also pointed out that if a tower is incompatible with the

land use at New Providence Road, given the existing power poles and lines on

the property, then presumably there is no agricultural parcel in Milton with

which a cell tower would be compatible and Milton's ordinance permitting cell

towers in agricultural zones is meaningless.  (Id.)  Finally, Mr. Blassingill stated

that T-Mobile had private meetings with a couple of Councilmembers during

which they discussed potential alternative technologies and why they would not

work in this area.  (Id. at 000722.)

One resident, Mr. Schmidt, spoke in favor of the tower.  He stated that the entrance to the Providence Lake neighborhood was more than half a mile from the tower site, and based on the area's topography,  "it would be impossible for anyone in that subdivision to see that tower even if it was 170 feet tall." (Id. at 000720.)  He noted that his house is the closest to the tower site and he could not see the balloon during the balloon test.  (Id.)

b.      Evidence in opposition to the application

The City's Community Development staff again recommended denial of the application because of the tower's incompatibility with Milton's long-term development plan and adjacent land uses.  (Id. at 000709-10.)  When asked whether the proposed tower was compatible with the existing power easement on the New Providence Road property, Ms. Tully responded that staff felt the tower was "incompatible with the neighborhood as a whole," particularly with adjoining residential and agricultural uses.  (Id. at 000715.)

Mr. Fey, a resident, spoke in opposition to the tower on behalf of the neighboring Providence Lake Homeowners Association.  Mr. Fey spoke about the availability of new technologies for improving cell service, and mentioned other events that had already negatively impacted home values in that

24

neighborhood (e.g., nearby location of a landfill).  (Id. at 000719.)  He also

expressed concern about potential negative health impacts, but the City

Attorney advised Councilmembers not to consider health issues in reaching

their decision.  (Id. at 000720.)

      Mr. Pace, another resident, also expressed concern about declining home

values in the Providence Lake neighborhood and stated that based on the

balloon test, homeowners could clearly see the proposed tower above the tree

line and the power lines.  (Id. at 000721.)  Furthermore, he did not believe T-

Mobile had demonstrated "with any type of facts that there is a need for its

customers to have more coverage than they currently have."  (Id.)  He labeled

T-Mobile's position about the need for better service "conjecture," and stated,

"we don't see a real demand."  (Id.)

               c.      Rationale underlying Milton's decision

      The Planning Commission offered no reasons for its recommendation to

deny the New Providence Road tower beyond those which have already been

discussed.  (See generally, Planning Comm'n Transcript, [1-5]; Planning

Comm'n Action Minutes, [22] CD-Rom, MTN_RD_000519.)  The City

Council conditionally approved the New Providence Road tower largely

25

because it would be located next to the existing 100-foot-wide power easement, allaying some aesthetic concerns that were present with the other two applications.  (City Council Transcript, [1-6] at 17-22 of 31.)  However, Councilmembers still expressed worry about the tower "blending in" with its surroundings, and ultimately settled on the following conditions: a stealth design (to be approved by the City's community development manager), a maximum height of 100 feet, and "the conditions of the City Development Department's recommended conditions that were included in their findings." (Id. at 21 of 31.)

The Development Department's conditions included: a 20-foot landscape strip in lieu of the required 10-foot strip to provide additional screening of the tower and associated facilities, and site maintenance only between 8:30am and 5:30pm, Monday through Friday, except in emergencies.  (City Council Minutes, [22] CD-Rom, MTN_RD_000710.)  The Department's rationale for imposing these conditions appears to be based on aesthetics and minimizing disruption to local residents.  (Id.)

C.    Analysis

T-Mobile maintains that there "is no substantial evidence to contravene

26

[its] demonstrated need for the towers at the heights requested." (Pl. Br., [23-1] at 14 of 26.) First, T-Mobile argues that recommendations provided by GTRS regarding Plaintiff's three applications do not constitute substantial evidence. (Id. at 15 of 26.) Although GTRS concluded that nearby properties would be preferable for the Mountain Road and Hopewell Road towers, T-Mobile points out that there is no evidence that nearby locations were actually available. (Id.) Additionally, T-Mobile claims, GTRS's recommendations regarding lower tower heights were not supported by data or evidence showing what coverage levels would be achieved at those lower heights, and none of Milton's City Council members requested such data or challenged GTRS's recommendations. (Id. at 16 of 26.)

Next, T-Mobile argues that generalized aesthetic concerns, lay persons' unsubstantiated opinions about the need for cell towers, and bald speculation about property values are not sufficient to support Milton's denial of the towers, particularly when T-Mobile put forth expert technical evidence on the same issues. (Id. at 17-21 of 26.) And finally, T-Mobile argues that the absence of wind load certifications from its applications does not amount to substantial evidence. (Id. at 22-24 of 26.) Indeed, T-Mobile notes, when Milton

27

conditionally approved the New Providence application, one condition was

provision of the certification at a later date.  (Id. at 22 of 26.)  Furthermore, T-

Mobile posits, if Milton did not think the applications were complete, the City

Council should not have considered the applications when it did, and principles

of estoppel preclude the City from now claiming that the applications were

defective.  (Id. at 23-24 of 26.)

The bulk of Milton's response focuses on the aesthetic concerns

expressed by residents, Community Development Department staff, and GTRS.

Specifically, Milton argues that its denial of Plaintiff's Mountain Road and

Hopewell Road applications "is supported by evidence of the visual impact of

the proposed [towers] on neighboring residences and the City's rural, bucolic

aesthetics."  (See, e.g., Def. Br., [26] at 13 of 27.)  According to Milton, it relied

on photo simulations of the towers provided by T-Mobile and residents, which

revealed that the towers would be clearly visible from roadways and

neighboring residences.  (Id. at 13, 19 of 27.)  Milton argues that such specific,

"crystalized" evidence of aesthetic impact does constitute substantial evidence.

Milton also argues that absence of wind load certifications is substantial

evidence supporting denial of Plaintiff's Mountain Road and Hopewell Road

applications, and to hold otherwise "effectively turns over control of the City's zoning requirements to T-Mobile, allowing it to pick and choose the elements it will satisfy." (Id. at 12-13 of 27.) According to Milton, its conditional approval of the New Providence tower allowing for later wind load certification "functions as the equivalent of a variance." (Id. at 12-13 of 27.)

Milton also relied on lay person testing of cell reception in the area to support its decisions. Milton notes, "Mr. Shepard and 25 other residents within the [Mountain Road] tower's anticipated propagation area tested T-Mobile's signal using T-Mobile phones. No dropped calls were reported; call clarity was acceptable; and in-home signal strength was not a problem." (Id. at 16-17 of 27.) Similarly, Ms. Norvell "detailed having tested T-Mobile's signal in the area to be serviced by the tower using her husband's T-Mobile phone and experienced no service problems, including at her own home across the road from the proposed [Hopewell Road] tower location." (Id. at 22 of 27.) Ms. Norvell also highlighted the "clear discrepancy between the propagation maps T-Mobile provided the City (showing poor coverage) and its online marketing materials (showing 'excellent' coverage)." (Id.)

29

Ms. Norvell also mapped out the addresses of T-Mobile's subscribers requesting better coverage in the tower areas (i.e., those who weighed in on the online feedback system) and the addresses of the 250 residents who signed her petition opposing the Hopewell Road tower.  According to Milton, "[h]er map demonstrated that the supporters did not live near the tower; in many instances they lived outside of the City altogether, and, therefore, would receive little benefit from the additional 'in-building' coverage that served as T-Mobile's premise for its tower."  (Id. at 20-21 of 27.)  The majority of residents opposing the towers, however, "lived within the immediate vicinity of the proposed location and would be directly impacted by its presence."  (Id. at 21 of 27.)

According to Milton, the New Providence Road location was unique because it adjoined an existing power easement containing high voltage transmission towers and lines.  (Id. at 23 of 27.)  "While the compatibility of the two uses at the site mitigated concern about a tower, that was true only to the point that the tower exceeded the height of the tree line."  (Id.)  However, T-Mobile's proposed 154-foot tower would have "soared above the tree line by 60 feet," and based on balloon test photos, would have been clearly visible from roadways and neighboring properties.  (Id. at 24 of 27.)  Therefore, the City

30

gave its conditional approval while also addressing "Milton's core mission of preserving its pastoral landscape as much as possible." (Id.)

"A blanket aesthetic objection does not constitute substantial evidence under § 332. Such a standard would eviscerate the substantial evidence requirement and unnecessarily retard mobile phone service development." Michael Linet, Inc. v. Vill. of Wellington, 408 F.3d 757, 761 (11th Cir. 2005) (internal citation omitted). But "aesthetics may constitute a valid basis for denial of a wireless permit if substantial evidence of the visual impact of the tower was before the zoning decisionmaker." Se. Towers, LLC v. Pickens Cnty, 625 F. Supp. 2d 1293, 1303 (N.D. Ga. 2008) (citing Preferred Sites, LLC v. Troup Cnty, 296 F.3d 1210, 1219-20 (11th Cir. 2002)). Additionally, aesthetic objections coupled with other concerns, such as declining property values, may constitute substantial evidence. Michael Linet, 408 F.3d at 761. "Also relevant is whether the company can reasonably place a cell site in an alternative location and eliminate the residents' concerns." Id. at 762.

Here, as T-Mobile notes, there were no available alternative sites for the three towers. Other potential sites were identified, but the landowners were not interested in leasing space to T-Mobile. Further, there is no evidence that

31

collocation was possible, or that the towers could be placed in a commercially zoned area. Although this factor is relevant, however, it is not determinative.

In Se. Towers, this Court found that aesthetic concerns of residents constituted substantial evidence where the residents' position was supported by photos taken during a balloon test and where the concerns were focused on incompatibility of the tower with the scenery of a particular historic district. 625 F. Supp. 2d at 1303-04. Here, the aesthetic objections to all three towers raised by City staff, GTRS, and residents were supported by balloon test evidence. Furthermore, residents from adjacent properties spoke about the towers' specific impact on their residences. Residents also spoke about specific farms, equestrian facilities, and scenic highway corridors that would be negatively impacted by the towers. Therefore, the Court finds that the aesthetic objections raised in this case go beyond general concerns, and like those raised in Se. Towers, are "grounded in the specifics of the case." Id. at 1304 (citing Sw. Bell Mobile Sys.s, Inc. v. Todd, 244 F.3d 51, 61 (1st Cir. 2001).

Furthermore, as noted by Councilmember Ragsdale during the Planning Commission's hearing, residents presented specific evidence that T-Mobile service in the proposed towers' coverage area was already adequate. In T-

32

<u>Mobile South, LLC v. Cobb Cnty</u>, No. 1:10-CV-0111-WSD, 2011 WL 336641, at *3 (N.D. Ga. Jan. 31, 2011), the court found substantial evidence supporting the county's decision to deny a cell tower application. The court's decision was based at least in part on residents' testimony that there was no need for the proposed tower.  There, resident opponents of the tower testified that service and signal strength was adequate and they were satisfied with the service in their neighborhood, thereby refuting T-Mobile's argument that it needed a tower to improve local service.  The residents in that case, like the case at bar, also noted that T-Mobile's website advertised a "best" signal strength in the area, despite its claims to the zoning board that coverage was lacking.

In this case, two residents (one speaking against the Mountain Road tower and the other speaking against the Hopewell Road tower) testified that they lacked adequate T-Mobile coverage in the towers' area.  Of course, T-Mobile maintains that there is a need for additional coverage at all three sites based on comments from their continuous feedback service.  However, several residents said they saw no need for additional service. Twenty-five residents tested coverage in the Mountain Road area and reported "100 percent coverage."  Ms. Norvell tested coverage in the Hopewell Road area and said she

33

experienced no dropped calls or service problems.  And Mr. Pace, an adjacent

property owner to the New Providence Road site, said he and his neighbors saw

no need for additional service and found T-Mobile's alleged need for a tower

there mere "conjecture."

The City Council was entitled to credit some witnesses over others, and

the Court will not second guess those decisions.  "[Federal courts] look at the

whole record; but, under the substantial evidence standard of Section 332, we

cannot displace the Board's fair estimate of conflicting evidence and cannot

freely re-weigh the evidence.  We only determine whether substantial evidence

exists to support the local board's decision."  Am. Tower LP v. City of

Huntsville, 295 F.3d 1203, 1209 n. 8 (11th Cir. 2002).  Here, both sides

presented evidence regarding the need (or lack thereof) for better coverage in

Milton.  The record shows that the Planning Commission and the City Council

balanced the specific aesthetic concerns of the community with the purported

need for additional coverage and concluded that the need did not outweigh the

harm.[5]

---

[5] A balancing of this nature is suggested by the comments of Commissioners
Ragsdale and Moore during the Planning Commission hearing, which mention lack of
need for additional coverage and the "height" or aesthetic issue.  This balancing is

34

With respect to the Mountain Road and Hopewell Road applications, the Board's calculation resulted in outright denial.  However, given the lesser aesthetic concerns with the New Providence Road tower, Milton granted a conditional approval.  The Court finds that there is substantial evidence in the written record – in the form of specific, fact-based aesthetic objections and testimony regarding adequate coverage in the area – to support all three of the City's decisions.

## Conclusion

Based on the foregoing, Plaintiff's motion for partial summary judgment based on § 332(c)(7)(B)(iii) is **DENIED**.

**SO ORDERED**, this 18th day of June, 2014.

_____
**RICHARD W. STORY**
United States District Judge

_____

also evident in Councilmember Thurman's comments with respect to the Hopewell Road application, in which she concluded that the harm of the tower at the proposed height outweighs the benefit.

35